Opinion

per curiam:

The scope of this suit has been narrowed since the filing of the petition and the intervening petition herein by the severance from it of some of the causes of action included in the petition, and their prosecution in this court as separate suits, or by the institution of suits before the Indian Claims Commission. It has been still further narrowed by the abandonment of some of the claims not severed out of the petition. The claims that the plaintiffs are still asserting are for the following matters:
1. Unpaid balances claimed to be due as consideration for the treaties of: August 3,1795; November 17,1807; September 24,1819; July 29,1829; March 28,1836.
2. Differences between the value of gold and currency used in making payments.
3. Trespasses in the cutting of timber upon plaintiff reservations.
4. Defendant’s use of plaintiff’s funds in the erection of school and agency buildings and for other administrative purposes.
5. Failure to let logging contracts to the highest bidders.
*598 6. Deduction of costs of scaling and other administrative expenses in logging tribal lands.
7. Failure to employ Indians in logging.
As to the claims under the named treaties, the history of the times shows that, while the treaties named the “Chippewa Nation of Indians” as parties, the treaties were in fact made with, and the payments to be made under them were understood to be limited to, only those of the numerous bands of Chippewas who were in the area where the lands dealt with in the treaties were situated. The lands involved were all east or south of the northern Wisconsin and northern Minnesota lands where the plaintiffs and the intervenors were. The plaintiffs and intervenors were not intended to have any share in the payments to be made under the treaties. In due time treaties were made with the plaintiffs and intervenors and they received the benefits of those treaties.
Our findings of fact are long and detailed. To repeat or paraphrase the findings in this opinion would be useless duplication. We have concluded that the evidence does not sustain any of the claims. The petitions of the plaintiffs and the intervenors will therefore be dismissed.
It is so ordered.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, as follows:
PARTIES AND ISSUES
1. The petition in this case was filed on April 1,1940, under the authority of the Act of August 30, 1935 (49 Stat. 1049), by the Mole Lake, Lac du Flambeau, Lac Court O’Reilles, Bad River (or La Pointe), Red Cliff, and St. Croix bands of Lake Superior Chippewa Indians of Wisconsin. These six bands are sometimes hereinafter referred to as the plaintiff bands.
On August 30, 1940, an intervenors’ petition was filed in behalf of the Fond du Lac, Grand Portage, and Nett Lake (or Bois Forte) bands of Lake Superior Chippewa Indians *599 of Minnesota. These three bands are sometimes hereinafter referred to as the intervenor bands.[1]
2. In 1854 [2] four reservations in northern Wisconsin were set apart for the use of Chippewa Indians of Lake Superior then living in the vicinities of the several reservations. These four reservations now bear the names of and are inhabited by four of the plaintiff bands, namely, the Lac Court O’Reilles, Lac du Flambeau, Red Cliff, and Bad River reservations.
The Mole Lake and St. Croix bands also' live in northern Wisconsin, on or in the vicinities of the four named reservations.
All of the plaintiff bands have lived in the northern part of Wisconsin, on or near the sites of the four reservations above named, at all. times material to this action.
3. The intervenor bands live in northeastern Minnesota, on or near reservations established in 1854.[3] They have lived in that area at all times material to this action.
4. In 1944, the swamp land causes of action of the Lac du Flambeau, Lac Court O’Reilles, and Bad River (La Pointe) bands were severed from this case and tried separately. That case is still pending.[4]
In 1945, the school land causes of action of the Lac du Flambeau, Bad River (La Pointe), and Red Cliff bands *600 were severed from this case and tried separately. That case was dismissed.[5]
5. On September 23,1949, there was filed a stipulation between the attorney of record for plaintiff bands and the individual plaintiffs, on the one part, and defendant on the other, as follows:
1. That cases Nos. 18, 18C, 18D, 18E, 18G, 18H, 18J, 18K, 18L and 18M before the Indian Claims Commission shall involve only claims asserted under subdivision 3, Section 2, Act of August 13,1946, as follows:
(3) claims which would result if the treaties, contracts and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; [60 Stat. 1049, 1050].
2. That case No. 45,162 in the United States Court of Claims shall not involve claims asserted under subdivision 3 of Section 2 of the Indian Claims Commission Act, 60 Stat. 1049, as quoted above, and
3. That any claims growing out of any failure of the United States to make payments promised by treaties to the plaintiff tribes of Indians shall be litigated in case No. 45,162 in the United States Court of Claims and that this litigation shall not be pleaded by rhe United States as a bar to the prosecution by plaintiffs of cases Nos. 18,18C, 18D, 18E, 18G, 18H, 18 j, 18K, 18L and 18M before the Indian Claims Commission, in which plaintiffs have filed claims under subdivision 3 of Section 2 of the Act of August 13, 1946, 60 Stat. 1049, as quoted above.
The foregoing stipulation was approved by the Court on the day it was filed, and the Court ordered that “this case proceed to trial on all issues except claims arising under subdivision 3, Section 2 of the Act of August 13, 1946, 60 Stat. 1049, as asserted in cases Nos. 18, 18C, 18D, 18E, 18Gf, 18H, 18J, 18K, 18L and 18M before the Indian Claims Commission.”
6. On April 13, 1951, the Commissioner to whom this case was referred notified the Clerk that proof in the case had *601 been closed. The evidence taken was confined to issues of fact and law relating to liability only.[6]
7. (a) The attorney of record for plaintiff bands has, in effect, stipulated with the trial attorney for defendant that all claims contained in the petition have been abandoned execpt (1) claims pending before the Indian Claims Commission as described in the stipulation recited in finding 5, (2) claims severed and tried in cases numbered 45,162 (I) and (II), as described in finding 4, and (3) claims listed by plaintiffs’ attorney in his Requested Findings and Brief.[7]
(b) In plaintiffs’ Requested Findings and Brief a “Statement of the Case” recites that “this action is * * * to recover
1. Unpaid balances claimed to be due as consideration for the treaties of:
August 3, 1795
November 17, 1807
September 24, 1819
July 29, 1829
March 28, 1836
2. Differences between the value of gold and currency used in making payments.
3. Trespasses in the cutting of timber upon plaintiff reservations.
4. Defendant’s use of plaintiff’s funds in the erection of school and agency buildings and for other administrative purposes.
5. Failure to let logging contracts to the highest bidders.
6. Deduction of costs of scaling and other administrative expenses in logging tribal lands.
7. Failure to employ Indians in logging.
*602 (c) No separate requests for findings of fact have been filed in behalf of the individual plaintiffs or the intervenor bands.
GENERAL
8. Among the Indians who inhabited North America when European colonization of this continent was begun in the sixteenth century was a large group which has since come to be known, because of linguistic features, as Northern Algonquians. This linguistic group included such smaller and •better known groups as the Chippewas, Delawares, Illinois, Miamis, Ottawas, Pottawatamies, and Shawanoes. There was a loose confederation between the Chippewas, Ottawas and Pottawatamies, who were sometimes referred to as the Three Fires.
9. At one time the Chippewas may have (according to their own traditions they had) lived on the Atlantic coast. They are believed by some historians to have begun their migration westward in the fifteenth century or earlier, and to have been in the area of the Great Lakes and the Mississippi River by 1492. In any event they were in that area in the seventeenth and eighteenth centuries, and were known as a distinct cultural group to the explorers, traders, and settlers who pressed into the Northwest Territory during the latter part of the eighteenth and the early part of the nineteenth centuries.
10. The Chippewas traced descent through the males and identified family lines by totemic distinctions. Ties of known blood relationship and totemic kinship were acknowledged within family groups and clans, and they shared a common cultural heritage. Otherwise, they were an individualistic people. The small groups in which they lived were usually comprised of a chieftain or headman and his brothers or other close relatives and their women and children. When any group became too large for its support to be readily drawn from the immediate hunting or fishing grounds, part of the group would split off into a separate village and occupy other lands usually nearby. In this manner clusters of villages developed, and have come to be known as bands, frequently named from the geographic area occupied. It was inherent in this process that headmen and *603 chiefs emerged as such on the basis of their personal influence over their kinsmen. Family and totemic position were important, but personal leadership was more so. Individual Chippewas responded to leadership, but seldom, if ever, did they acknowledge authority imposed. Because of these characteristics of the Chippewas as a people, their leaders were of many and varied gradations of influence at any particular time and within any specific area.
11. White men in the Northwest Territory found the Chippewas to be a nomadic people who lived by hunting and fishing. The areas occupied by them south of Lake Superior, in what are now the states of Wisconsin and Minnesota, were characterized by large stands of pine timber in which there was little or no underbrush. The portions of rivers and streams traversing these stands of timber were devoid of fish. The pine forests were therefore sterile, from the standpoint of the Indians, since conifer supported neither game nor fish. Interspersed among the pine forests were stands of deciduous trees and open spaces where game was plentiful and fish wére abundant in the lakes and rivers. There the Indians lived in small groups or villages near the food supply, moving from time to time from one hunting or fishing ground to another.
ALLEGIANCE
12. By the end of the American Revolution the Chippewas had spread over a wide area' and were found, with other tribes of Indians, in territory now included in the states of Ohio, Michigan, Indiana, Illinois, Wisconsin, Minnesota, and the Dakotas. In the course of their expansion they had driven back the Iroquois on the east and the Foxes and the Sioux on the west. One historian expresses the opinion that their militant dispersal to the east, south, and west resulted from their eagerness to trade furs to the white men for guns, ammunition, and liquor. Such a thesis finds support in the fact that the Chippewas generally were in rapport with the nationalities of the white men with whom they traded. Chippewas living in the areas affected by the conflict between French and British over Canada first stood with the French, with whom they had traded, until the British were vie- *604 torious. Similarly, Chippewas who had dealt with the British in Canada aligned themselves with the British against the Americans in the War of 1812.
13. The Treaty of September 8,1815,[8] between the United States and “the Wyandot, Delaware, Seneca, Shawanoe, Miami, Chippewa, Ottawa, and Potawatimie Tribes of Indians, residing within the limits of the State of Ohio, and the Territories of Indiana and Michigan,” began with these words:
Whereas the Chippewa, Ottawa, and Potawatimie, tribes of Indians, together with certain bands of the Wyandot, Delaware, Seneca, Shawanoe, and Miami tribes, were associated with Great Britain in the late war between the United States and that power, and have manifested a disposition to be restored to the relations of peace and amity with the said States: * * *
On September 8, 1815, the State of Ohio and the Territories of Indiana and Michigan included only the areas now contained in the States of the same names.[9]
14. After the close of the War of 1812, the British maintained an Indian agency on Drummond Island.[10] Many Chippewa Indians living south and west of Drummond Island, including some Chippewas of Lake Superior, visited this British agency through the years and as late as 1830.
In 1822 the United States established an Indian agency at Sault Ste. Marie (in what is now Michigan) for the express purpose of endeavoring to quiet down the Chippewa Indians living in the United States territory south and west *605 of there. A few years later, a subagency was established at Michilimackinae to assist in the endeavor.
15. It is not established by the evidence that any of the plaintiff or intervenor bands (a) ever committed, warlike acts against the United States or (b) acknowledged allegiance to the United States prior to 1822.
TREATIES [11]
16. In the 86 years from 1785[12] to 1870[13] (both inclusive), Chippewa Indians were parties to 43 treaties with the United States. The first three of the treaties (1785, 1789, and 1795) represented efforts to establish peace between the several Indian tribes and the United States. The commitments made by the Indians in the first two treaties were not sufficiently honored by them to accomplish the intended purposes. The third treaty covered the same points as the first two.
17. The first two treaties (1785 and 1789) to which Chippewa Indians were parties were made with the panoply of commissioners plenipotentiary of the United States. Sachems and warriors represented the several Indian “nations.” In the Treaty of Greenville (August 3, 1795; 7 Stat. 49) General Anthony Wayne, as “sole commissioner” for the United States, dealt with the Indian “tribes.” Commissioners plenipotentiary appeared again in the treaties of 1808 and 1816, only. The word “nation”[14] recurred in the treaties as late as 1838, appearing in 16 of the 26 treaties made with Chippewa Indians up to that time.
18. The Treaty of Greenville (August 3,1795; 7 Stat. 49) “declared” peace and described a “general boundary line” between the lands of the United States and the lands of the. *606 Indians. ■ This line ran in a southwesterly direction from the mouth of the “Cayanhoga” river to the mouth of the “Kentucke” river. The Indians ceded “all their claims lying eastwardly and southwardly of-the general boundary line.” Among other obligations assumed by the United States in this treaty there was a promise.to deliver to the Chippewas “henceforward every year forever” goods of the value of $1,000.[15]
In 1805[16] the Indians again ceded to the United States the land east and south of the boundary line described in the Treaty of Greenville.
19. By the Treaty of November 17,1807 (7 Stat. 105), the Indians ceded lands in Ohio and Michigan, for which the United States agreed to pay, among other considerations, “an annuity forever,” of $800 to the Chippewas.[17]
In 1808[18] further cessions of land in Ohio were made.
.In 1815[19] the United States again “gave peace” to the Chippewa, Ottawa, and Pottawatamie tribes, who had been associated with Great Britain in the War of 1812, and the Treaty, of Greenville (1795) was again confirmed. . :
In 1816[20] the Indians made a further cession of lands in Illinois and southern Wisconsin.
*607 20. Lewis Cass was appointed territorial governor of Michigan in 1816, and began negotiations with the Indians of that area in 1817.' He was one of the two commissioners for the United States who made the Treaty of September 29, 1817 (7 Stat. 160), whereby the Indians (including the Chippewa “nation”) ceded lands in Ohio, Indiana, and Michigan.
By the time Lewis Cass went to Michigan, responsible officials of the United States (including Cass) realized that success in treating with the Indians required councils with headmen who could command the following of all of thé Indians occupying the area to be quieted. The Indians, on their part, had long since learned that presents might and probably would be passed out at councils with the white men.[21] As a consequence, many councils were 'attended by some sachems and warriors who were more eager than they were qualified to represent the real parties in interest.
21. By the Treaty of September 24,1819 (7 Stat. 203) the Indians ceded land in Michigan (subject to reservations of 16 tracts comprising 101,400 acres “for the use of the Chippewa nation of Indians,” and 16 sections for the use of named individuals, described as “Indians by descent”); and the United States agreed “to pay to the Chippewa, nation of Indians, annually, forever, the sum of ” $1,000,[22] and “to provide and support a blacksmith for the Indians at Saginaw, so long as the President of the United States may think proper * * ■*.”
22. In 1820, Henry B. Schoolcraft joined the staff of Lewis Cass as. a geologist. In 1822, he began his. work as Indian Agent.at Sault Ste.'Marie, Michigan (Territory). School-craft spent 30 years among the Indians and came to know them, particularly the Chippewas, as well as any man' of his time.
*608 Early in his work Schoolcraft realized the importance of being able to identify roving bands of Indians by tribes and by the geographical areas in which they usually resided. Shortly after the opening of the Indian Agency at Sault Ste. Marie, he began the task, in which he persevered over the years with unremitting care, of identifying and listing the Indians of the Michigan-Wisconsin-Minnesota area according to tribes, bands, and customary habitat. This task was rendered more important by the necessity for him, as the administrative officer in charge of arrangements, to determine the identity of individuals as well as bands who were proper and legal recipients of the various annuities required by treaty and provided by Congress.[23]
23. Four treaties of the 1820’s[24] to which Chippewa Indians were parties reflect the effort on Schoolcraft’s part to improve order in Indian affairs. The purpose of these four treaties was to promote peace among warring Indian tribes, including the Chippewas, Ottawas, and Pottawata-mies (the loose federation known as the Three Fires), and the Sioux, Fox, Menominee, Iowav, and Winnebago. Boundary lines between the several tribes were defined and agreed upon. One of the four treaties was made for the express purpose of communicating with and obtaining the assent of the Chippewas of Lake Superior.[25]
24. By the Treaty of July 29, 1829 (7 Stat. 320), “the United Nations of Chippewa, Ottawa, and Pottawatamie Indians, of the waters of the Illinois, Milwaukee, and Mani-touck Rivers” ceded land in Illinois and southern Wisconsin, *609 in consideration of which the United States agreed “to pay to the aforesaid nations of Indians * * * annually, forever” the sum of $16,000, “said sum to be paid at Chicago.”[26]
25. On August 10, 1830, Schoolcraft wrote the Secretary of War:
There is but a single annuity payable by existing treaties to the Chippewas of Lake Superior. It is that of one thousand dollars, annually (during the pleasure of Congress), provided by the Treaty of Fond du Lac. This annuity is pledged, by the Chippawas, for the support of a school, and is paid to the Treasurer of the Baptist Society at Boston.[27]
26. By the Treaty of March 28,1836 (7 Stat. 491), between the United States (Henry K. Schoolcraft, commissioner) and “the Ottawa and Chippewa nations of Indians,” lands in Michigan were ceded to the United States (subject to stated reservations for the use of several different groups or bands of Indians), and the United States agreed “to pay to the Ottawa and Chippewa nations” various annuities to Indians within defined areas in Michigan.[28]
27. By the Treaty of October 4, 1842 (7 Stat. 591), made at La Pointe, Wisconsin, with the Chippewa Indians of the Mississippi and Lake Superior, the Indians ceded land in Wisconsin and Michigan, in consideration of which the United States agreed “to pay to the Chippewa Indians of the Mississippi, and Lake Superior,” annually, for 25 years, in specie, $12,500, and other considerations.
28. By the Treaty of August 2, 1847 (9 Stat. 904), the Chippewa Indians of the Mississippi and Lake Superior *610 ceded land in Minnesota, in consideration of which the United States agreed “to pay to the Chippewas of Lake Superior” $17,000 in specie, and “to the Chippewas of the Mississippi,” a like amount, also in specie, “within six months after this treaty shall be ratified.” There was a further obligation to pay to the Mississippi Indians $1,000 annually for 46 years.
29. By the Treaty of September 30,1854 (10 Stat. 1109), made at La Pointe, Wisconsin, the Chippewa Indians of Lake Superior and the Mississippi ceded .lands in Michigan, Wisconsin and Minnesota (including lands occupied by the plaintiff and intervenor bands). Reservations were set apart by the United States from the ceded lands “for the use of the Chippewas of Lake Superior,” including specified reservations for “the La Pointe band, and such other Indians as may see fit to settle with them,” for “the other Wisconsin bands,” “the Fond du Lac bands,” “the Grand Portage Band,” and other bands not included among plaintiff or intervenor bands herein.
In return for the cessions of land the United States agreed “to pay to the Chippewas of Lake Superior, annually, for the term of twenty years, the following sums, to wit:” $5,000 in coin; $8,000 in goods, household furniture and cooking utensils; $3,000 in agricultural implements and cattle; and $3,000 for moral and educational purposes.
30. The Treaty of July 31, 1855 (11 Stat. 621), niade at Detroit, with “the Ottawa and Chippewa Indians of Michigan, parties to the treaty of March 28, 1836,”'[29] contained the following provision:
The Ottawa and Chippewa Indians hereby release and discharge the United' States from all liability on account of former treaty stipulations, it being distinctly understood and agreed that the grants and payments herein before provided for are in lieu and satisfaction of all claims, legal and equitable on the part of said Indians jointly and severally against the United States, *611 for land, money, or other thing guaranteed to said tribes or either of them by the stipulations of any former treaty or treaties; * * *
31. The whole series of treaties between the United States and various groups of Chippewa Indians was primarily concerned with the use and occupancy of land. When the series was begun, Chippewa Indians were dispersed, with other Indian tribes, over areas extending north and west of the Ohio River to the Rocky Mountains of the Dakotas. As white men moved across the Northwest Territory, into Ohio, Indiana, and Michigan, the United States held repeated councils and made successive treaties with the various tribes of Indians, constantly seeking to define and redefine boundaries between the Indians and the settlers. The' early efforts to treat with the Indians were obviously empirical. As experience multiplied, methods of intercourse and forms of expression that had proved compatible with the pride, dignity, and understanding of the Indians-were retained. Some of the forms of expression, particularly the designations of Indian “nations” and'“tribes”, assumed definitive reality only in the process of administration.[30]
The Indian lands west of the various boundaries were not well known during the early years of this process. The interest of the United States was centered on the lands east of the various boundaries, which were known. After 1816, the course of dealing established the practice of the United States in treating- with Indians of fairly well defined geographic areas.[31] From the beginning the obligations assumed by the United States, as to the recipients of money, goods, and services, were defined by administration.
, 32. After the advent of Lewis Cass in 1817 and Henry R. Schoolcraft in 1822, all responsible officials of the United *612 States were careful, in their dealings with the Chippewa Indians, to summon to council the headmen of all bands known or believed to be in occupancy of the lands in question or otherwise interested in matters to be discussed, and not to sunnnon other Indians. Schoolcraft was meticulous in his determinations of bands and individuals to whom the obligations of the United States were payable, in all treaties made before and during his term as Indian Agent, and in the discharge of those obligations.[32]
33. It is not established by the evidence:
(a) That the United States, in any of the treaties to which Chippewa Indians were parties, dealt or purported to deal with Indian headmen capable of representing all Indians of the cultural group included in the tribal name of Chippewa.
(b) That any interest of any of the plaintiff or inter-venor bands was , involved in any treaty prior to 1825.
(c) That any land occupied by any of the plaintiff or in-tervenor bands was involved in any treaty prior to 1837.
(d) That any of the obligations of the United States contained in the Treaty of August 3, 1795 (7 Stat. 49), the Treaty of November 17, 1807 (7 Stat. 105), the Treaty of September 24,1819 (7 Stat. 203), the Treaty of July 29,1829 (7 Stat. 320), or the Treaty of March 28,1836 (7 Stat. 491), ran to the plaintiff or intervenor bands or any of them, as such.
(e) That any of the plaintiff or intervenor bands was a party to any of the treaties listed in the preceding subparagraph.
SPECIE PAYMENTS[33]
34. The Indians early expressed a preference for hard money as the medium of payment of annuities payable in money. The Treaty of September 29, 1817 (7 Stat. 160), *613 provided for the payment, annually, for 15 years, of $1,000 in specie, and the United States also agreed in the future to pay the annuity due by the Treaty of Greenville (August 3, 1795) in specie. By the Treaty of September 24, 1819, the United States agreed to pay, annually, $1,000 in silver, and that “all annuities due by any former treaty * * * shall be hereafter paid in silver.” Specie payments were also promised in treaties made in 1829,1836,1842, and 1847, while the payments required by the Treaty of September 30,1854, were to be made “in coin”.
35.Chippewa Indians of Lake Superior gave the following receipt for treaty payments made to them in the year 1864:
We the undersigned Chiefs, Warriors, Heads of families of the Chippewas of Lake Superior within the Lake Superior Agency, hereby acknowledge receipt to us from S. E. Webb, U. S. Indian Agent, of the sum of Ten Thousand Six Hundred and Sixty-Six and 66/100 Dollars in the sum of Two & 25/100 Dollars to each individual as per the following pay roll. The said payment being made at Fon Du Lac Sept. 19th, at Bed Cliff Sept. 23rd, at Grand Portage Oct. 3, at Bad Kiver Oct. 8ths and at Wausaw Oct. 21st, 1864. The above amount being paid in United States currency is not considered by us to be in full for our annuity payment due the present year as per treaty stipulations with the United States. We acknowledge the receipt of the amount paid us and claim a balance due us to be adjusted hereafter.[34]
36. Treaty payments to Chippewa Indians of Lake Superior for the year 1864 were made by the United States in currency to the extent of $10,666.66.
37. It is not established by the evidence:
(a) From what specific treaty or treaties the obligation arose to make the payments described in findings 35 and 36.
(b) That any treaty payments other than those described in findings 35 and 36 were made in currency rather than coin.
*614 (c) That there existed in 1864 a difference in value between currency and coin.[35]
(d) What proportions of the payments described in findings 35 and 36 were made to members of plaintiff or inter-venor bands, or any of them.
LOGGING [36]
38. The Treaty of September 30, 1854, contained the following provisions:
Article 2. The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following tracts of land * * ' *: * * *
Article 3. The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to timé, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. * * *
39. Twenty years elapsed after the Treaty of September 30, 1854, before individual allotments were made in considerable numbers.' During that time, and especially after the close of the Civil War, the Indian Office and the various Indian Agents in charge of the affairs of plaintiff bands were concerned with the use that might be made of tribal lands for the benefit of the Indians living thereon.
*615 The pine forests represented the most obvious natural resource of the reserved lands. The pine lands were of little or no use to the Indians. As long as the pine remained, the lands supported no game, and they could not be cultivated until cleared. On the other hand, the logging of timber in Wisconsin was steadily increasing in volume, and there was a market for the pine.
In 1872, the Indian Agent in charge of the affairs of plaintiff bands entered into a contract with a local lumber man whereby the contractor was licensed to cut some of the pine on the unallotted lands of the Lac Court O’Reilles reservation in return for stipulated annual payments.[37] The contractor made two of the annual payments, and cut some timber. The license was revoked in 1874, after the decision by the Supreme Court in the case of United States v. Cook. The headnotes of the report[38] of that decision follow:
1. Timber standing on lands occupied by the Indians cannot be cut by them for the purposes of sale alone; though when it is in their possession having been cut for the purpose of improving the land — that is to say, better adapting it to convenient occupation — in other words, when the timber has been cut incidentally to the improvement, and not cut for the purpose of getting and selling it — there is no restriction on the sale of it.
2. The Indians having only a right of occupancy in the lands, the presumption is against their authority to cut and sell the timber. Every purchaser from them is charged with notice of this presumption. To main- ■ tain his title it is incumbent on him to show that the timber was rightfully severed from the land.
8. The United States may maintain an action for unlawfully cutting and carrying away timber from the public lands.
40. The Cook decision put an end to the efforts of the Office of Indian Affairs to obtain revenue for the benefit of the plaintiff bands (and all other Indians living on tribal lands in Wisconsin) through the sale of green timber growing on tribal lands.[39] Thereafter, at all times material to *616 this action, the cutting of live timber on the unallotted lands of the reservations assigned to plaintiff bands was regarded as a trespass, and the trespasser was required to respond accordingly.[40]
41. There followed an extended period of hardship and want for members of plaintiff bands living on unallotted lands of the reservations.
In the meanwhile, interest in the logging of timber in northern Wisconsin increased. Logging crews and saw mills of many operators pressed into the timber on all sides of the reservations of plaintiff bands. In due time, proposals were made to individual Indians to buy the timber on their allotments. The Indian Office was thereby confronted with the question as to whether or not the Indian owner of an allotment could sell the timber thereon, and, if so, how, and under what conditions. Although the Indian Office took the position from the outset that the allottee could sell the timber,[41] 15 years or more elapsed from the time the question was raised until satisfactory methods were devised for administering such sales.
42. In October 1876 and February 1877, two separate inquiries were addressed to the Department of the Interior as to whether or not Indians on the Bad River reservation holding allotments of land in severalty had the right to dispose of the timber upon their respective allotments. The answer to the first inquiry was an unqualified affirmative, while the reply to the second inquiry, although also affirmative, suggested .that the Agent should be consulted. The Indian Agent was then advised by the Indian Office that lands would not be considered as allotted until the selection of each individual had been reported to and approved by the Secretary of the Interior. In April 1877, the Indian Agent reported the first of what proved to be a long series of incidents *617 wherein white lumber men had cut timber from Indian allotments before the allotments had been fully approved.[42]
43. The winter months were used for the logging season in northern Wisconsin. After the unfortunate start made on the Bad River reservation in the winter of 1876-1877,[43] no more timber was cut from the allotted lands on that reservation (and little, if any, from the other reservations of plaintiff bands) until the winter of 1882-1883.[44]
44. Following is the substance of a letter dated September 27, 1882, to the Commissioner of Indian Affairs from W. R. Durfee, the Indian Agent:
* * * I would make the following suggestions, * * * as to the proper course to pursue in regard to the sale of timber by the Indians.
I do not think lumbermen should be allowed to purchase the stumpage and put their own crews in the timber to cut it. The result of this would be that the timber would be scalped, the tops and hollow or shaky butts would be left in the woods, only the best logs taken, and the rest a total waste. Whites upon the reservation should be considered trespassers. The Indians should be allowed to make contracts for their logs, subject to department approval, through me, delivered upon the bank of river, and should do the work themselves, thus getting the greatest benefit from the timber.
The white purchasers would of course have to furnish the supplies for the work, and might be allowed to put a foreman in the camp to instruct the Indians to do the *618 work properly. There are a great many thousand dollars worth of pine on the Lac Court O’reilles reservation, and whether the Indians get any benefit from it or otherwise depends entirely upon how it is handled. If the timber is allowed to be slaughtered all at once the result will be, that the reservation will be denuded of its most valuable feature and the Indians poorer than at present. If they do the work and receive the benefit there is value enough there to make them all independent. * * *
45. In a letter dated October 9, 1882, to Hon. Angues Cameron, La Crosse, Wisconsin, the Secretary of the Interior said:
I have received and considered your communication * * * inquiring what terms and conditions in contracts by lumber men with Indians holding patents for their lands in the Lac Court d’Oreille reservation, in Wisconsin, would ba satisfactory to the Department
The contracts for the sale of the timber, should be made with the Indians owning the land, under the supervision of the agent for the Indians, subject to the approval of this Department. The timber should be cut by the Indians and delivered by them on the banks of the river. The price to be paid should be the fair cash value of the timber laid down on the banks of the river, and payment should be made therefor when it is so delivered.
Crews of white men cannot be allowed on the reservation for the purpose of cutting the timber. If it should be found necessary a proper person as agent for the purchaser and at his expense may be permitted by the Indian Agent to go among the Indians to see to the proper cutting of the timber, its measurement, etc.
The timber should not be cut to waste, and not more than three fourths thereof on each tract, should be disposed of, leaving one fourth as near as may be, in a compact xorm for the further use of the Indians.
These instructions will be communicated to Agent of La Pointe Agency at Bayfield, Wisconsin.
The instructions were communicated to Agent Durfee, and the cutting of timber from allotted lands was resumed during the season of 1882-1883.
46. No detailed regulations by the Department of the Interior governing the marketing of timber on the allotted lands of the reservations of plaintiff bands during the 1870’s *619 and 1880’s are in evidence. It is not established by the evidence that any such regulations were issued. In any event, many of the contractors did not receive instructions or did not understand the instructions they received. Under the ruling of the Secretary of the Interior (quoted in the preceding finding) it was required that (1) the Indian allottee should hold a patent to the land, and (2) his contract for the sale of the timber had to be approved by the Secretary of the Interior. Any cutting done before both of these requirements were met was considered by the Department of the Interior to be a trespass.
47. Even if the cutting was done in good faith, on lands believed to have been allotted and patented, and under a contract made under the supervision of and approved by the Indian. Agent, and by him forwarded to Washington for departmental approval, it was nevertheless considered a trespass if, because of a clerical oversight or other reason the patent had not been issued or the contract approved.
As departmental rulings finally developed, every lumber man guilty of a trespass (on allotted or unallotted lands) was required to pay (1) the value of the timber cut, if the trespass was unwitting, or (2) double the value of the timber cut, if the trespass was wilful.
. In the case of trespasses upon lands believed to have been allotted the payment for the value of the timber went to the allottee, if the title matter was finally resolved in his favor; otherwise, the payment went to the band, since the cutting had been done on tribal (unallotted) land.
48. Over the years numerous trespasses were committed by white lumbermen on allotted and unallotted lands.[45]
49. (a) The contractors who had cut timber on the Bad Biver reservation during the season of 1876-1877 were charged with trespasses for cutting on lands on which the allotments had not matured. They were forbidden to resume cutting during the next season on lands for which they had already made advancements. The cutting of timber was virtually at a standstill until 1882-1888.
*620 (b) The ruling by the Secretary of the Interior of October 9, 1882 (finding 45), was made so late in the season that no great volume of timber was cut during the season of 1882-1883.
(c) A substantial volume of timber was cut during the season of 1883-1884. During that season, however, an issue arose as to the necessity for departmental approval of the contracts, and the Agent was reprimanded by the Commissioner of Indian Affairs for having permitted the cutting to proceed under contracts which had not been approved (partly because the Agent was late in submitting them for approval). Also, during that season, the Agent did not enforce the letter of the Secretary’s declared policy with respect to the use of Indian labor.
(d) During the season of 1884 — 1885, the Agent rigidly enforced the departmental requirements as to approval of contracts and the use of Indian labor, and the volume of timber cut declined substantially below the volume that had been cut the previous season.
50. The major cause of this decline in the volume of timber cut stemmed from difficulties encountered with the requirement that Indian labor be used. The ruling by the Secretary of the Interior had provided that:
* * * The timber should be cut by the Indians and delivered by them on the banks of the river. The price to. be paid should be the fair cash value of the timber laid down on the banks of the river, and payment should be made therefor when it is so delivered. * * *
The volume of timber on many (if not most) of the allotments was such that the allottee could not cut and bank it alone. He had to employ labor.[46] By the terms of the Secretary’s ruling, payment was not to be made until the timber was cut and banked. Very few of the Indians had sufficient capital to carry through such a venture. Advances were required of and were made by the purchasers.
The price offered by the purchaser for the timber cut and banked reflected his appraisal of (1) the value of the stump-age, (2) the cost of cutting and banking, (3) the remaining *621 costs of transportation and milling, and (4) the price he could command in the market, from which he expected, of course, to realize a profit. The price accepted by the allottee reflected his appraisal of (1) the value of the stumpage and . (2) the cost of cutting and banking. Obviously, the stump-age value realized by the allottee depended upon the.cost expended for cutting and banking.
The Indians who were employed to cut and bank.the timber were often unskilled. Under the circumstances created by departmental policy, many of them proved to be unreliable. When white crews were forced to leave the Indian lands, and it was apparent that only Indians would be employed, many of the Indians refused to work except upon payment of considerably higher wages than the white crews had received. When their demands were met, many of them would work only a few days at a time.
Two adverse results flowed from this situation. (1) Allot-tees often found themselves forced to spend, for cutting and .banking, all of (and sometimes more than) the price they were to receive for the timber, leaving them nothing (or less) to represent the value of their stumpage. (2) Purchasers often found that, after they had. advanced all of the purchase price, some or all of the timber purchased was not ready for delivery.
51. Shortly after the advent of the first Cleveland Administration (March 4, 1885), W. R. Durfee was replaced as Indian Agent by James T. Gregory, cashier of a bank at Ashland, Wisconsin, and one-time bookkeeper and log scaler for a lumber company. Gregory was not a man to be deterred by red tape. He was unimpressed by official channels. Some of the departmental rules he altered; some he ignored; and some he openly violated.
When Gregory took office, there were many more allotments of land within the reservations of plaintiff bands on which the timber had not been cut than there were allotments from which the timber had been cut. Many more allotments were made during his term. Gregory made it his business to see to it that allottees who wanted to sell their timber should have opportunity to do so, and, in addition, that they should realize net values to themselves. for the timber.
*622 During the seasons of 1885-1886 through 1888-1889, Agent Gregory departed from the straight and narrow path of official requirement in the following respects:
1. He permitted contracts to be made and carried out before departmental approval had been given to (a) the allotments or (b) the contracts.
2. He failed in many instances to forward the contracts to the Commissioner of Indian Affairs for departmental approval.
3. He approved and permitted the execution of contracts for all of the timber on some allotments, instead of limiting the cutting to three-fourths of the timber.
4. He required the purchasers to guarantee to the allottees a net return on their stumpage values.
5. He permitted the purchasers to use white crews in cutting the timber.
52. Investigations of Gregory’s administration of the Office of Indian Agent, made during and after his term by officials of the Department of the Interior, found no fault with the records in Ms office, made no criticism of the end results obtained by him for the Indians under his charge, and cast no reflections on his personal integrity. Before Gregory’s term ended, the Secretary of the Interior reviewed and ratified his actions in all material respects. Whatever may have been his shortcomings and offenses, in the relation of a subordinate to his superior officers, it is not established by the evidence that the rights of the Indians of plaintiff bands, individually or collectively, were prejudiced by Gregory’s actions.[47]
53. On March 5, 1888, the United States Senate adopted a resolution directing the Select Committee on Indian Traders—
* * * to inquire into the methods of allotting lands in severalty to Indians upon the Court Oreille^ *623 Lac du Flambeau, Bad River, Fond du Lac, and other Indian reservations in the northern portions of Wisconsin and Minnesota, and into the system under which Indians to whom lands have been allotted are allowed to sell the timber thereon; and especially to inquire whether or not adequate prices are paid to Indians under such sales; * * *
On March 2, 1889,[48] the Select Committee reported, presenting to the Senate “the testimony taken by the committee and the conclusions reached from such testimony.” The report presented a blistering attack upon Agent.Gregory for “willful and deliberate disobedience of laws and orders, and gross abuse of official power”; upon J. D. 0. Atkins, lately Commissioner of Indian Affairs, for “inexcusable neglect of duty and serious administrative incapacity”; and upon William F. Vilas, Secretary of the Interior, who was held “responsible” and considered “censurable”.[49]
*624 54. The Act of February 16, 1889,[50] provided as follows:
The President of the United States may from year to year in his discretion under such regulations as he may prescribe authorize the Indians residing on reservations or allotments, the fee to which remains in the United States, to fell, cut, remove, sell or otherwise dispose of the dead timber standing, or fallen, on such reservation or allotment for the sole benefit of such Indian or Indians. But whenever there is reasonable cause to believe that such timber has been killed, burned, girdled, or otherwise injured for the purpose of securing its sale under this section then in that case such authority shall not be granted.
55. During the winter seasons of 1889-1890 through. 1891-1892, logging operations were virtually at a standstill on all of the reservations of all of plaintiff bands. No specific order closing down the operations was issued. The shutdown resulted from the chilling effect upon officials of the Department of the Interior of the report issued in March 1889 by the Select Committee of the Senate. The Indians suffered severely from deprivation and want as a result of the inaction.
56. On September 27, 1892, the Secretary of the Interior submitted to the President, with his recommendation for approval, a proposal by J. H. Cushway and Company for the purchase of timber on the Lac du Flambeau reservation. The letter said in part:
The timber to be cut under this authority is all the merchantable standing and dead and down on the allotted lands, and the merchantable dead and down only, on the common lands. Cushway & Co. to establish a mill on the reservation for the manufacture of timber and shingles and employ Indians who may be willing to work in doing the logging.
The President approved the proposal on September 28, 1892. Forms of contracts between Cushway and the Indians were drawn, regulations were issued, and the cutting of timber was begun during the season of 1892-1893. The Cush-way mills were built in 1893, and the arrangement was *625 thereafter continued on a mutually satisfactory basis for more than 20 years.[51]
57. On November 27, 1893, the Secretary of the Interior submitted to the President, with his recommendation for approval, a proposal by J. S. Stearns to purchase the timber on the Bad Eiver reservation under an arrangement similar to the Cushway program on the Lac du Flambeau reservation. The proposal was approved, the Stearns mills were built, and the arrangement resulted in mutually satisfactory relationships for upward of 20 years.
58. After logging operations were resumed on the Lac du Flambeau and Bad Eiver reservations, as described- in the two preceding findings, cutting was also resumed on the Lac Court O’Eeilles and Eed Cliff reservations. The arrangements made for the two reservations last named are not described in the evidence.
HIGHEST BIDDER [52]
59. On October 2,1872, the Indian Agent in charge of the affairs of plaintiff bands entered into a contract with William A. Eust under the terms of which Eust was given permission to cut some (but not all) of the pine timber on un-allotted lands in the Lac Court O’Eeilles reservation. The license was to continue for ten years from December 1,1872. Eust agreed to pay $50,000 for the timber, payable $10,000 annually, on December 1, from 1872 through 1876.
This contract (hereinafter referred to as the Eust contract) was promptly forwarded by the Indian Agent to the Commissioner of Indian Affairs, who approved it and sent it to the Secretary of the Interior on October 10, 1872, with his recommendation for departmental approval, which was given on that date or shortly thereafter. On November 18, 1872, the Indian Agent forwarded to the Commissioner of Indian Affairs the written consent of “all the chiefs and headmen of *626 the bands of Chippewas of Lac Court O’Reilles reservation” to the Rust contract.
60. (a) On November 19,1872, Laird, Norton & Company, a lumber firm of Winona, Minnesota, forwarded to the Commissioner of Indian Affairs an offer of $100,000 for all of the pine timber on the Lac Court O’Reilles reservation.
(b) On December 1, 1872, Rust made the first payment of $10,000 under his contract. The money was paid to the Indian Agent.
(c) On December 16,1872, an Assistant Attorney General of the United States forwarded to the' Secretary of the Interior a legal opinion in which he considered the question which had been referred to him as to whether the Rust contract should be set aside to permit consideration of the Laird, Norton offer. His conclusion was that the Rust Contract was a valid and binding contract which should not be disturbed.
61. (a) On February 6, 1873, a supplemental contract was made between the Indian Agent and Rust, whereby Rust’s license to cut timber was extended to December 1, 1892, and Rust agreed to pay $75,000 additional, payable at the rate of $5,000 annually, on December 1, from 1877 through 1891. The supplemental contract was approved by the Commissioner of Indian Affairs and, on April 19, 1873, by the Acting Secretary of the Interior.
(b) On December 1,1873, Rust made the second payment of $10,000 to the Indian Agent under the Rust contract.
(c) On December 1, 1873, the Secretary of the Interior wrote to the Commissioner of Indian Affairs:
Referring to certain contracts for the sale of timber and other valuable material upon Indian reservations made by authority of the Indian Office, you are informed that the power of the Indians upon reservations, or of Indian Agents, to make such contracts with the sanction of the Indian Office, in pursuance of a practice which I understand has hitherto prevailed, has been questioned, and the. subject is now being investigated by the Assistant Attorney General for this Department, and, after his opinion has been rendered it will be referred to the Hon. Attorney General for his advice.
You are, therefore, directed to notify all parties with whom such contracts have been made, not to proceed further in their operations thereunder until otherwise instructed by this Department.
*627 (d) On December 6, 1873, the Acting Commissioner of Indian Affairs forwarded to the Indian Agent the substance of the advice he had received from the Secretary of the Interior, stating specifically that it applied to the Bust contract;
62. On May 4, 1874, the Supreme Court of the United States announced its decision in the case of United States v. Cook.[53] ...
63. (a) On October 12, 1874, Bust wrote to the Commissioner of Indian Affairs requesting permission to make the December payment of $10,000 to a St. Paul bank, thereby obviating the necessity for a trip to Bayfield, Wisconsin. On November 17,1874, the Commissioner of Indian Affairs wrote Bust:
This office declines to receive, or authorize the Agent to receive, .any further payment or payments under the contract in question for the present.
(b) The 1874 payment was not made by Bust, and no further payments under the contract or its supplement were made by him.
(c) The evidence does not disclose how much timber was cut by Bust or what adjustment, if any, was made with him on account of his contract and its supplement.
64. It is not established by the evidence:
(1) That there was any irregularity in the making of the Bust contract.[54]
(2) That any contract other than the Bust contract was made for the sale of live, green timber on unallotted lands of any of the reservations of any of plaintiff bands.
USE OE FUNDS [55]
65. The sum of $20,000 was paid to the Indian Agent by Bust under the contract described in findings 59 to 63. A *628 payment of $10,000 under the contract was refused by order of the Commissioner of Indian Affairs.[56] Of the $20,000 received, the sum of $4,516.44 was covered into the United States Treasury. An additional sum of $15,446.45 was. disbursed for the following purposes:
Lac Court O’Reilles:
Agricultural aid_$1. 708.61
Agricultural implements and equipment- 317. 65
Clothing_ 773.26
Education:
Books, stationery, etc_ 44. 62
Erection and repairs of school buildings- 1,061.36
Pay of teachers_ 989.27
Expenses of per capita payments- 182. 00
Feed and care of livestock- 265.39
Hardware, glass, oils and paints- 290.88
Household equipment- 260.02
Indian dwellings- 228.41
Livestock_,_ ■ 391.50
Miscellaneous Agency expenses- 356.21
Miscellaneous building materials-:- 30. 00
Pay of carpenters_ 199.00
Pay of farmers_ 1,020.93
Pay of interpreters_ 100.00
Pay of miscellaneous employees- 286.20
Per capita cash payments_ 1,000.00
Provisions_J- 3, 919.00
Transportation, etc., of supplies- 1,245.29
Traveling expenses of Agent on trip to Washington, D. C., at request of the Lac Court O’Reilles chiefs— 173.70
14,843.30
Red Cliff:
Agricultural aid- 37.11
Clothing_ 489.66
Pay of catpenter_ 34.00
560. 77
Bad River: Pay of blacksmiths- 42.38
Total_ 15,446.45
The balance of $37.11 was disbursed for the Grand Portage Band of Chippewas in Minnesota.
*629 66. (a) It is not established by the evidence that “prior to 1899 the sum of $25,000.00 was received by the defendant for timber cut upon the Lac du Flambeau Reservation, which sum was used by defendant for the erection of school buildings upon said reservation.”[57]
(b) On October 1, 1896, the Commissioner of Indian Affairs, acting with departmental approval, instructed the Indian Agent to proceed with a plan he had submitted to construct school buildings on the Lac du Flambeau reservation with timber and the proceeds of timber to be cut from unallotted lands. The Agent was directed to take the timber from unallotted swamp and school lands. Pursuant to these instructions and authority subsequently given, the Agent arranged with the Flambeau Lumber Company (formerly J. H. Cushway & Co.) to cut and manufacture the lumber and erect the buildings, payment to be made in timber to be taken from swamp lands. The total cost of the improvements was $23,934.39. The sum of $11,895.04 was paid to the Flambeau Lumber Company in swamp land and school land timber. When the State of Wisconsin asserted an interest in the swamp lands, payments in timber cut therefrom were suspended. The balance of $12,039.35 was paid to the Flambeau Lumber Company by Congressional appropriation [58] which specifically recognized the debt due to the Flambeau Lumber Company and confirmed the authority of the Secretary of the Interior to enter into the arrangement.
(c) When the school buildings described in the preceding subparagraph had been completed, the Flambeau Lumber Company installed an electric lighting system in the school and furnished the current for the lights over a period of years (1897-1902) before any settlement was made for either the installation or the current. In 1914, an offset of $1,913.08, determined to represent the value of the installation and current, was allowed against a claim upon the Flambeau Lumber Company for $2,848.22 for failure to cut *630 certain dead timber from unallotted lands within the Lac du Flambeau reservation.
TRESPASSES [59]
67.In June, 1897, the sum of $14,766.82 was received by defendant from J. S. Stearns for timber cut from unal-lotted lands of the Bad Liver Reservation. Of this sum, $9,766.82 was covered into the Treasury of the United States and set up on the books of the Department of the Interior to the credit of the Bad River Band. The balance of $5,000 was expended during fiscal 1897 for roads on the Bad River reservation.
USE OP INDIAN LABOR [60]
68. It is not established by the evidence:
(1) That the failure by Agent Gregory to enforce the previously announced policy of the Department of the Interior favoring the employment of Indians to the exclusion of white crews deprived anj’’ member of any of the plaintiff bands who wanted to work of the opportunity to do so.
(2) That the Indian Office or the Indian Agent (Gregory) adopted or used a form of contract which was a subterfuge to avoid the use of Indian labor.
(3) That any of plaintiff bands or any member thereof suffered loss of income as a result of Agent Gregory’s action with respect to the employment of white crews.
EXPENSES [61]
69. Regulations promulgated under the authority of the Act of February 16, 1889,[62] provided that (a) one-half the *631 cost of scaling and (b) other administrative expenses should be deducted from the proceeds of sales of 'timber cut from tribal lands. The division of the cost of scaling between buyer and seller was in conformity with the practice prevailing in the industry. Deductions were made from the proceeds of sales of timber cut from the tribal lands of plaintiff bands, representing one-half cf the cost of scaling plus some additional allowance for the cost of administration. It is not established by the evidence that any such deductions were exorbitant or unreasonable.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs and the intervenors are not entitled to recover, and the petition and intervening petition are therefore dismissed.

 Distinction must be made not only between plaintiff bands and the inter-venor bands, but between bands, whether plaintiffs or intervenors, and individual plaintiffs. On August 24, 1940, the Court granted a motion filed by the attorney of record for plaintiff bands to make parties plaintiff seven individuals, said to be members of the Business Committee of the St. Croix band, as follows: Lee Taylor, Louis Murgow, John H. Lonestar, Andrew E. Connors, Clifford Wakemeup, George Hart, and John King.

 Treaty of September 30,1854 (10 Stat. 1109).

 The treaty of September 30, 1854, was made with "the Chippewa Indians of Lake Superior and the Mississippi.” Indian bands specifically named as parties to the treaty included three of the plaintiff bands (La Pointe, Lac Court O’Reilles, and Lac du Flambeau), two of the intervenor bands (Grand Portage and Fond du Lac), and some of the Bois Forte (Nett Lake) band. Reservations were set apart by the treaty for the Grand Portage and Fond du Lac bands, and provision was made for a reservation for “the Bois Forte Indians who are parties to this treaty.”
The treaty further provided that “all Indians who are parties to this treaty, except the Chippewas of the Mississippi, shall hereafter be known as the Chippewas of Lake Superior.” The plaintiff bands do not comprise all of the Lake Superior Chippeawa Indians in Wisconsin. The intervenor bands do not comprise all the Lake Superior Chippewa Indians in Minnesota.

 Case No. 45162 (I). See Mole Lake Band et al. v. United States, 114 C. Cls. 71.

 Case No. 46162 (XI). See Mole Lake Band et al. v. United States, et al., 113 C. Cls. 16.

 The Rules of the Court were revised on May 15, 1951. Prior to the revision, Rule 39 (a), provided that “(a) In every Indian case, unless otherwise ordered by the Court or stipulated by the parties, the hearing in the first instance shall be limited to the issues of fact and law relating to the right of the plaintiff to recover * .*

 Defendant requested the following finding, to which attorney of record for plaintiff bands has stated he has no objection: “In their petition filed with the Court April 1, 1940, plaintiffs allege numerous claims. Many of these claims, plaintiffs abandoned after the evidence was closed. As to alleged claims where the plaintiffs failed to make requested findings of fact, the preponderance of the evidence conclusively proves that plaintiffs have no right to recover.” Defendant’s Requested Einding 46.

 7 Stat. 181.

 The ordinance for the government of the territory northwest of the Ohio River was adopted on July 13, 1787 (1 Stat. 50). By the Act of May 7, 1800 (2 Stat. 58) the Northwest Territory was divided into two parts, one part being what soon thereafter became and now is the State of Ohio. The remaining part of the Northwest Territory became the Indiana Territory.
By the Act of January 11, 1805 (2 Stat. 309), there was withdrawn from the Indiana Territory all that portion of the present State of Michigan represented by the mitten and thumb and part of the northern peninsula. The part so withdrawn was made the Territory of Michigan, and as such remained virtually unchanged until 1834 (4 Stat. 701), when a portion of the Illinois Territory (including what is now the State of Wisconsin) was added to it.
What is now the State of Indiana was made into a territory in preparation for statehood, by the Act of February 3, 1809 (2 Stat. 514), and the remainder of the former Indiana Territory became the Illinois Territory.

 Drummond Island is now the easternmost point off the tip of the northern peninsula of Michigan. It was not determined to be united States territory until 1831.

 Cf. finding 7 (b). Plaintiffs’ claim is for “unpaid balances claimed to be due as consideration for” five specified treaties.

 The first treaty between the United States and Chippewa Indians, made on January 21, 1785 (7 Stat. 16), was the third treaty between the United States and Indian tribes.

 The Act of March 3, 1871 (16 Stat. 566; 25 U. S. C. 71) provided: “No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired.”

 The connotation of the word “nation” at that time carried a greater emphasis on cultural ties than on political bonds.

 Ti,e Treaty of August 3, 1795, Is the first of the five treaties under which plaintiffs claim “unpaid balances * . * * • due as consideration for” the treaty. By the Act of- May 6, 1796 (1 Stat. 640), Congress authorized annual appropriations for carrying the treaty into effect. Such annual appropriations were thereafter made through 1812 and after. Records of payments for years prior to 1812 are not available. During the period from January 1, 1812, to June 30, 1856, according to the records of the General Accounting Office, a total of $44,000 was disbursed by the united States in annuity payments for the benefit of the Saginaw Bands of Chippewa Indians. By the Treaty of July 31, 1855 (11 Stat. 621), and the Treaty of August 2, 1855 (11 Stat. 633), the Chippewa Indians of Michigan released the United States from all liability on account of former treaty stipulations. Cf. Binding 30 and footnote 29. Payments to Chippewa Indians under the Treaty of August 3, 1795, were thereafter discontinued.

 Treaty of July 4,-1805 (7 Stat. 87).

 The Treaty' of November 17, 1807, is the second of the five treaties under which plaintiffs claim, ffhe obligation of this treaty (insofar as it ran to Chippewa Indians) was, like that of the Treaty of August 3, 1.795, treated as running to Chippewa Indians of Michigan (the Saginaw Band in particular). Payments- appear to have been made regularly until the release contained in the Treaty of-July 81, 1855 (11 Stat; 621), and the Treaty of August 2, 1855 (11 Stat. 633). Cf. Finding 30.

 Treaty of November 25,1808 (7 Stat. 112).

 Treaty of September 8, 1815 (7 Stat. 181). Cf. Finding 13.

 Treaty of August 24,1816 (7 Stat. 146). ’•

 The practice was early established- and long maintained of providing food for the attending Indians. In some of the earlier councils, liquor was also provided. . ■ . ■

 The Treaty of September 24, 18.19, is the third of the five treaties under which plaintiffs claim. During the period from January 1, 1820, to June SO, 1856, the United States disbursed $36,000 in annuity payments to the Saginaw Band of Chippewa Indians pursuant to this treaty. . Payments were discontinued after the releases contained in the Treaty of July 31, 1855 (11 Stat. 621), and the Treaty of August 2, 1855 (11 Stat. 633). Cf. Finding 30.

 The identification of Indians, by tribes and bands, and as individuals, has proved a continuing task for the white man. Cf. Clyde F. Thompson, et al. v. United States, decided May 6, 1952, on appeal from the Indian Claims Commission. While the Chippewa tribe has long been known, the identity of some of its bands was at one time in issue in the instant case, and the Office of Indian Affairs and the General Land Office are still engaged in efforts to identify individual Chippewas.

 Treaty of August 19, 1825 (7 Stat. 272) ; Treaty of August 5, 1826 (7 Stat. 290) ; Treaty of August 11, 1827 (7 Stat. 303) ; and Treaty of August 25, 1828 (7 Stat. 315).

 Treaty of August 5, 1826 (7 Stat. 290), between the United States and the Chippewa Tribe of Indians. “Whereas, * * * owing to the remote and dispersed situation of the Chippewas, full deputations of their different bands did not attend at Prairie du Chien, which circumstance * * * would render the Treaty of doubtful obligation with respect to the bands not represented * * *.”

 The Treaty of July 29, 1829, Is the fourth of the five treaties under which plaintiffs claim. Pursuant to the obligation of the treaty, payments were made by the united States to Chippewa Indians (and to the Ottawas and Potta-watamies) over a period of many years, until the obligation was commuted. It is not clear from the General Accounting Office report (in Court of Claims No. H — 211) to what band or bands of Chippewas these payments were made. Some of the payments were made to Chippewas living in Michigan. Other payments were made to Chippewas of Michigan, Illinois, and Wisconsin, who moved to Iowa, then to Kansas, and were incorporated with the Pottawatamies.

 The Treaty of Pond du Lac was the Treaty of August B, 1826 (7 Stat. 290). See footnote 25.

 The Treaty of March 28, 1836, is the last of the five treaties under which plaintiffs claim. The obligations of this treaty were discharged by the United States to Chippewa and Ottawa Indians living in Michigan until the release contained in the Treaty of July 31, 1855 (11 Stat. 621). Cf. Finding 30.

 The Indians who were’ parties to the Treaty of March 28, 1836, were described therein as “the Ottawa and Chippewa nations of Indians, by their chiefs and delegates.” Actually, the parties to the treaty were Ottawa and Chippewa Indians of Michigan. There is no evidence that the release of former treaty obligations, contained in the Treaty of July 31,1855, was applied against Chippewas other than those residing in Michigan.

 Chippewa, Indian's were aware of this practical-application as'early as the Schoolcraft regime.

 By the Treaty of June 16, 1820. (T Stat. 206), the .Chippewa “tribe” ceded to the United States 16 square miles near the Canadian border. On July 6, 1820, by another, treaty (7 S'tat. 207), the Chippewa “nation’.’ ceded islands in Lake Huron, .... • ■
...By .the Treaty of September 26, 1833 (7 Stat. 431), the Chippewa “nation” ceded lands in' Wisconsin, Illinois, and Iowm .On September 27, 1833, .by another treaty (7 Stat. 443), the Chippewa “nation”, by chiefs and headmen residing in Michigan, ceded land in Michigan.

 During his tenure as Indian Agent, Schoolcraft was responsible for administering all of the five treaties under which plaintiffs claim.

 In plaintiffs’ Statement of the Case, opening their requested findings and brief, this claim is described as “Differences between the value of gold and currency used in making payment.” Plaintiffs have cited no treaty containing an obligation to make payments in gold.

 Vayment of $10,666.66 to individuals at the rate of $2.26 per person -would mean separate payments to some 4,740 individuals.

 Cf., The AMERICANA, 1912, “Greenbacks * * * The current name * * * of the legal tender notes first issued by the government during the Civil War. * * * The authorizing act was signed by Lincoln 25 Feb. 1862; it- was the first ever passed by Congress making anything but coin legal tender * * *. The great inflation, the uncertain fortunes of war, and the belief that even if victorious the United States neither could nor would pay Its enormous debt at face value, but would repudiate or scale it, combined to depreciate the value of the notes; throughout 1864 they were worth on an average only about 45 cents on the dollar. * * *”

 The five claims of plaintiff bands, other than treaty balances alleged to be due and the value of specie payments, arise in one way or another from the logging of timber on the reserved lands. The findings which follow under the heading of "Logging” contain the background, only, of these five claims. Each claim is hereinafter considered under a separate heading.

 The details of this transaction are set forth in findings 59 to 64.

 19 Wallace 591.

 When Congress later authorized the sale of mature living timber on unallotted lands of Indian reservations, by the Act of June 25, 1910 (36 Stat. 857 ; 25 U. S. C. 407), the States of Minnesota and Wisconsin were excepted.

 As to the Bad River Reservation, see 38 Stat. 605; and as to the Lae du Flambeau Reservation, see 43 Stat. 132.

 Reliance was had upon the provisions oí the Treaty of September 30, 1854 (finding 38), to the effect that the President could, at his discretion, issue patents for the allotted lands “with such restrictions of the power of alienation as he may see fit to impose.” The reasoning was that the President could authorize the sale of timber on allotted lands, as a phase of his authority over the power of alienation.

 Variations of this theme, as later developed, included the following: (1) the Indian had made his selection, but it had not been approved by the Agent; (2) the selection had been approved by the Agent, and the allotment forwarded, but the allotment had not been approved by the Secretary of the Interior; and (3) the allotment had been approved by the Secretary of the Interior, but no patent had been issued to the allottee.

 The second administration of President Grant came to a close on March 4, 1877. J. L. Mahan, who had been the Indian Agent in charge of the affairs of plaintiff bands during most of the Grant Administration, remained in office during the administration of President Hayes (1877 — 1881). With the exception of Mahan, there were changes in the personnel of the Department of the Interior and the Office of Indian Affairs in the Hayes Administration, the Garfield-Arthur Administration (1881-1885), the first Cleveland Administration (1885-1889), the Harrison Administration (1889-1893) and the second Cleveland Administration (1893-1897). The effect of these changes is sharply reflected in the record of this case.

 W. R. Durfee succeeded J. L. Mahan as Indian Agent early in the Garfield-Arthur Administration, which began on March 4, 1881. (Durfee was a sincere official, but not gifted with insight into the practical difficulties of administering the measures he recommended.

 Although one of the claims of plaintiff bands is described in their Statement of the Case (see finding 7) as “trespasses in the cutting of timber upon plaintiff resérvations,” plaintiffs cite no instance of alleged trespass on tribal lands for which settlement has not been made, and a review of the record has failed to disclose such a trespass.

 The necessity for employing labor was first graphically illustrated by a series of contracts in which the allottees were women.

 Following is an excerpt from a report on Gregory’s actions by an Indian Inspector, dated May 22, 1888 : * * Whilst I do not attempt to justify subordinates in acts of disobedience of orders or instructions from their superiors. yet if the best interest of the Indians is the object to be accomplished in allowing them to sell their pine, then it will be admitted from the testimony on this subject that, in permitting them to sell their pine for a stumpage price, and the use by contractors of white labor in cutting and banking the timber, resulted in large gains to the Indians. * * *”

 Two days before the end of the first Cleveland Administration and of the 50th Congress.

 Excerpts from the report follow:
“* * * The censure expressed in this report upon Commissioner Atkins and Agent Gregory is based mainly upon the fact that while the » * » limitations — that the Indians should not sell stumpage, but should themselves cut and deliver the timber, and that no white crews should be allowed — were observed and obeyed during the three years prior, to 1885, * * * they were absolutely disregarded and defied during the three years subsequent to 1S85 * * *.
“* * * upon the advent to power in March, 1885, of a national administration eager to serve personal and political ends, one class of its favorites sought out the traderships at the various Indian agencies with black-mailing designs, and another class turned their longing eyes toward the valuable forests of pine timber upon the Chippewa Indian Reservations. But the latter saw that under the system adopted by the previous administration and conducted by Mr. Durfee there could be no chance for plunder or illegitimate profit. To break down the system directly it was seen might be difficult. It ivas determined to do it more easily by indirection, and, as a first step, to find as Mr. Durfee's successor some person who would wield unscrupulously the vast powers of the Indian agency.
“Such a person was found * * * [in] * •> * James T. Gregory. • * *
“* * * It appears to have been determined by the Secretary -that some means should be devised for stripping the reservations of all the timber possible before the 4th of March, 1889. * * »
“* * * it is with difficulty that the committee can use moderate language in characterizing the action of Secretary Vilas. * * *”
N. B. — William F. Vilas of Wisconsin, was Postmaster General in the first Cleveland Administration until he became Secretary of the Interior in 1888. While serving as Postmaster General he had recommended the appointment of Gregory as Indian Agent. Vilas was elected to the Senate from. Wisconsin in 1891.

 25 stat. 673; 25 U. S. C. 106.

 The main reason for the highly satisfactory relationship with Cushway, from the standpoint of the Indians and the Government, was the policy which Cnshway initially established and consistently maintained, of finally yielding every point of a major dispute to the Indians and the Government.

 Plaintiffs’ claim, as described in their Statement of the Case (finding 7), is for “failure to let logging contracts to the highest bidders.” In their re-guested findings, plaintiffs document only one instance of such an alleged failure. That instance relates to the Rust contract, the details of which are set forth in the findings under this heading.

 See finding 39.

 Plaintiffs have cited no statute or regulation applicable at the time which would have required the Indian Agent to issue an invitation for bids before entering into a contract.

 Plaintiffs’ claim, as described in their Statement of the Case (finding 7), is for ‘.‘defendant’s use of plaintiffs’ funds in the erection of school and agency-buildings and for other administrative purposes.” Claims documented under this heading include (1) disposition of the money paid to the Indian Agent by Rust and (2) two items in the accounting with Cushway for timber cut on the Lac du Flambeau reservation.

 Finding 63.

 Quotation is from paragraph 39 (b) of plaintiffs’ proposed findings of fact. The documentation in support of the request is so incomplete that no affirmative conclusion can be based upon it.

 Act of May 31,1900; 31 Stat. 221.

 See finding 48, and footnote 45. The claim documented by plaintiffs under this heading relates only to the use by defendant of moneys paid by the Stearns Lumber Company for timber cut from the Bad River Reservation. It is therefore essentially of the same type as the items for which plaintiffs claim under the heading “use of Funds”, described in findings 65 and 66.

 Plaintiffs’ claim, as described in their Statement of the Case (finding 7), Is for “failure to employ Indians in logging.” Claims documented under this heading relate entirely to the period 1885-1889, when James T. Gregory was Indian Agent. For details of the Gregory management, see findings 49 to 53.

 Plaintiffs’ claim, as described in their Statement of the Case (finding 7), is for “deduction of costs of scaling and other administrative expenses in logging tribal lands.” The claim detailed under this heading, that “said expenses so charged were exorbitant and were improperly, deducted,” is undocumented.

 For citation and text of the Act, see finding 54.